Good morning, Your Honors, and may it please the Court, David Solomons, representing Appellants, the Biomet entities. The plaintiffs entered into distributorship agreements with Biomet that authorized them to sell and receive commissions on certain Biomet products within a specified geographic area. Section 9 of the agreements establishes a post-retirement long-term commission program that is based on a percentage of net sales, which is defined to be those, quote, at the time this program is initiated, which is at the time. Mr. Hess, forgive me, but I am going to start you right out because I would really appreciate it if you could explain how is Section 9 of the distributorship agreement not ambiguous? Not only does it not define the term that you just mentioned, subject distributorship, but as the trial revealed, it seems to leave, or it does leave, a number of important questions unanswered, such as what happens when a Biomet product that the plaintiffs sold is later assigned to a Biomet subsidiary. So, if you could start out answering those questions, it would be most helpful, for me at least. Of course, and thank you, Your Honor, for the question. The fundamental reason why this language is not ambiguous and clearly refers not just to the geographic scope of the distributorship, but the product limitations of the distributorship as well, is because it references within the distributorship. It doesn't say within the territory of the distributorship, and the agreement refers to territory several times when it wants to speak about the territorial limitations separate and apart from the product limitations. The very concept of a distribution agreement has both a product-based and a geographic-based element, as the district court specifically determined. There's no question, and I don't think there's a dispute, that the distributorship that's established by the agreement has product limitations. They don't get commissions for selling everything. They only get commissions for selling Biomet products that are specified in the commission provision, and so what the distributorship, it brings with it not just the territorial restrictions that existed at the time they retired, but also the geographic ones, so that only the products that plaintiffs were authorized to sell under their Biomet distributorships are included in the net sales used to calculate the long-term commission. Mr. Simons, is it fair to say that Biomet's understanding as to which product lines plaintiffs were owed lifetime commissions has evolved, let's say, evolved over the course of this process, have identified seven different iterations of which products were covered in Biomet's view, and if that is so, wouldn't that tend to confirm that the contract was ambiguous? No, Your Honor. This court determines ambiguity as a matter of law based on the language of the agreement. That's the fundamental error that the district court made here. Their counting of all the different permutations of formulations we think is terribly misleading and is all based on evidence outside of the contract, outside of the terms of the contract, so it doesn't come into that initial legal determination that we say is the fundamental error here. Keep in mind, Your Honor, that the fundamental legal question at summary judgment, and indeed throughout the whole case, was set up, this is on A55, excuse me, 55 of the appendix from the district court summary judgment determination. The court set up the legal question correctly. Biomet argues that, I'm just quoting it, Biomet argues that the contracts entitle the distributors to long-term commissions on the same set of products that they were authorized to sell during their distributorships, which are primarily reconstructive products, joint replacement products. The distributors contend that the long-term commissions apply more broadly to all products sold under the Biomet brand regardless of whether they sold those products as part of their former distributorships. So that sets up the legal question. Does the reference to net sales within the subject distributorship refer to the products that they were authorized to sell within the territory they were authorized to sell it at the time they retired, or is it just a reference to the territorial restrictions and any products are covered? Mr. Sammons, I think you're undoubtedly correct that 9E brings with it more than a geographic or more than a territorial limitation. There's no question there's a product limitation within, but then to observe that there's a product limitation does not answer what's the content of the product limitation. And I think that therein lies the ambiguity, at least for me. And the reason that I think the denial of summary judgment was appropriate, you can, and I'm inviting you to push back here, okay, is because you have to read 9E in relationship to Section 2, and in particular to the language in Section 2 that contemplates that there's going to be some new items added. And the moment that you do that, I think that's where your client starts to have a harder time with arguing that it is so unambiguous that we, you know, we win as a matter of law under Rule 56. So how is that line of thinking mistaken in your view? Well, I think the first thing I would point out, Your Honor, is that you have to look at it in the context of the dispute in this case. This was not a dispute about whether, primarily about whether certain products that they were authorized to sell and did in fact sell under their Biomat distributorships, whether they were denied commissions on those. This is a case, fundamentally, in every category that went to the jury, in our view, fits into this description. This was a case about whether products that they were never authorized to sell under their Biomat distributorships at the time of their retirement, that they're, whether they're entitled to commissions on those products. Well, I thought, I thought, so take trauma products, for example, right? I thought that some of the, they necessarily, with respect to the long-term commissions or the so-called retirement, excuse me, retirement commissions, I thought part of that dispute was, well, they definitely didn't sell some trauma products because Biomat, or ultimately Zimmer Biomat, those products weren't even part of the product line at that point in time. They were later acquired through, for example, the acquisition of DePue or others that way. Well, that's right, Your Honor, and that, we think, ends the inquiry under the plain terms of the agreement. No, but I think what, we'll see in a few minutes, but I think your colleagues on the other side of this would say, well, hold on, hold on. No, they were selling, the distributors were selling trauma products. They were selling sports products, and in their view, therefore the category, right, gets kind of swept in for purposes of the long-term, you know, commission calculation. Thanks again for the question, Your Honor. Let me address both of those categories. We think this is fundamental to why there has to be a reversal in this case. With the Court's indulgence, I'll start with the sports products because I think it most cleanly illustrates the error that the district court made here. It is true, plaintiffs did sell sports products before they retired, but it is undisputed that they did so only through a separate and distinct distributor agreement with a separate legal entity, Arthrotech, and not as part of their Biomat distributorships. And their Arthrotech distributor agreement, you can see this on page 292 of the appendix, which did not provide for long-term commissions, expressly stated that it was, quote, separate and distinct from your Biomat distributorship. Under no plausible reading of Section 9E, could the net sales of the subject distributorship, the Biomat distributorship established by the agreement, include sales of products sold through a separate distribution agreement with a legally distinct corporate entity? There is simply no way to reconcile the award of commissions for Arthrotech sports products with the plain language of the Biomat agreements. And so I think for the sports, it's true they sold them, but it is undisputed that the only sports products they sold were under a separate distributor agreement with Arthrotech that said it was separate and distinct from the Biomat distributorship. And so when Section 9E... Hold on one moment, because the district court noted that there was evidence that Biomat agreed lifetime commissions were owed on products that were distributed through subsidiaries. Even, and I think this is, you know, the salient point, even subsidiaries that did not exist at the time of the plaintiff's retirement. So I think, Your Honor, what the district court said was at the time the long-term commission program was agreed to, not initiated at retirement. But here's the point I would make about that, Your Honor, that whole line of inquiry. Our argument to this court has nothing to do with whether it was a subsidiary or not a subsidiary. The question is, were they authorized to sell the products under their Biomat distributorship at the time that they retired? And what the undisputed record here makes clear is that there were some products of subsidiaries that they were authorized to sell under their Biomat distributor agreement, most notably the OEC Orthopedic Equipment Company products. That was a subsidiary. It was largely developed and acquired in 1987 after the distributorships here were initially set up. Its undisputed plaintiffs have been and continue to be paid long-term commissions on OEC products because they sold them under their Biomat distributorships. There were other subsidiary products, and again, this is undisputed, that they were never authorized to sell as part of their Biomat distribution agreement. In fact, they never sold them prior to the time that they retired. The most salient example there is EBI products. Can we go back, though, to the – I'm sorry. Go ahead. But how were we able to sidestep the subsidiary? So the relevant question under the plain terms of the agreement is, were they authorized to sell the products within the territory at the time they retired? And for some subsidiaries, the answer is yes, they were authorized to sell. Those were the OEC ones is a good example. For some, they never got to sell them. EBI is a good example of that. The other categories that they lost at trial, the dental and the biologics and some of the others fit into that category as well. And then there's one, and this is the Arthrotec products, where they were authorized to sell those but only pursuant to a separate and distinct distributor agreement with a separate legal entity, which by definition can't be net sales within the subject distributorship reference in the Biomat distributor agreement. And so the whole thing about subsidiaries is a bit of a red herring. It's a bit of an obfuscation, with all respect. The question is, what were they authorized to sell? What was within their Biomat distributorship at the time they retired? And if you conclude, as we think you must, that that Biomat distributorship included both product-based and territorial limitations, then you have to reverse because the trial court held the opposite. It held that it was ambiguous as to whether any product-based restrictions were appropriate, and it submitted to the jury then, and it found commissions owed on two categories of products that we've been talking about, sports, which it can't be within the subject distributorship because it was only sold pursuant to a separate distributor agreement, and then the trauma products. And what we know about the trauma products that are in dispute in this case, Your Honors, is that while it's true that they sold some plates and pins and screws, a very small number of products that could be used for trauma but were also related to the primary product line, the standard product line for reconstructive products, they never sold the products that they're seeking commissions on here, which were later acquired after they retired from DePue Medical. And at the time they retired, that was a subsidiary of Johnson & Johnson. But isn't that where the ambiguity lies right there? Because you made this point, I think, pretty clearly in your brief, that they were small. And you can tell me if I've mischaracterized. They were selling some trauma products, just very small volumes of these pins and screws and what have you, and then the world just totally opened up for a biomet and ultimately Zimmer biomet with the 1992 DePue acquisition, right? Well, that's correct, but they were never – but those – let me speak to that. But my point is that just by category, right, they were earning some active commissions, albeit on a very small volume of pins and screws and plates. But those had to have fit within some category in 2B. I don't know which category they fit in. You would know, right? So when they're earning commissions on that, it seems that the product category is within the scope of the distributorship. So, Your Honor, let me address that specifically. If you look at 239 as a good example, there's multiple samples of these agreements. But 239 is one in the appendix. What do you mean 239? I'm sorry, that's in the appendix. 239 of what? The appendix has Section 2 of the agreement. I was just going to point out to the categories that Your Honor asked about. And the product categories that are identified, and it's later referred to as the standard product line, these are the reconstructive products, and it lists total joints, endoprosthesis, instruments, fixation devices. I would submit that that's the category that pins and screws and plates fit into. And then it lists others, wound, suction, soft goods, splints, and special and or custom products. The agreement does authorize those product lines to increase during the period of the active distributorship. But during that period, they never included the types of trauma products that they're claiming commissions on now. Those trauma products were completely different. There was a whole line that immediately made a biomed in its subsidiaries able to compete in Tier 1 trauma unit type medical devices. It was a market they never had before. And when they acquired DePue, that's when those product lines came on. But these distributors never sold anything like those products at the time. And so it was not within the subject distributorship at the time of their retirement. Now, again, we also know that there were some small number of what might be considered more traditional trauma products, Your Honor. Prior to the acquisition of DePue, those were sold exclusively by EBI, and it's undisputed that the distributors here could not sell those trauma products at the time they retired. Because when Biomed acquired the product line that became EBI, it brought with it its own distribution network of Salesforce and everything else. And so even before the DePue combination or acquisition in 2012, long after their retirement, the distributors here could not sell anything like the type of whole product trauma products that they're claiming commissions on now. And so for that reason, we think that is out as well. But I would, again, just point out that reversal is required because we know that just take, again, the sports products, which made up about half of the commissions that were awarded, those could not possibly be within the subject distributorship under the plain terms of the agreement. I'm almost out of time. I'd like to reserve what I have left for rebuttal if that's all right with the court. Of course. Thank you. And thank you. Unless, do either of you have? All right. Mr. DeArmond. Thank you. Travis DeArmond of McCool Smith for the plaintiff appellees. May it please the court. And your honors, I'd like to start immediately with the ambiguity of the contracts because that's where the court started and because that resolves this appeal. Again, the question before the court isn't even are we are we convinced that Biomet's interpretations of these agreements are correct? It is could reasonable people armed with these contracts come to different interpretations? And what we argued at summary judgment, what we argued at trial, what I would still submit is a reasonable argument, a reasonable interpretation of the distributorship agreements is. This begins with an undefined phrase using undefined terms that even Biomet admits must be understood by reference to other provisions in the contract. That provision that provides for the payment of retirement commissions on gross sales within the subject distributorship at the time of retirement, which is the time the program is initiated. It is entirely reasonable, for example, to interpret that phrase consistent with the non-compete provision that follows immediately in Section 9H. What are the bookends around this clause, product-based limitations? I mean, if we pull the thread all the way out. So what we argued at summary judgment, and I think it's so reasonable, is that there were no product-based limitations other than they were sold by Biomet, whether through Biomet subsidiaries or otherwise. And one of the reasons for that interpretation is, again, this non-compete provision in Section 9H. As the court will see, this non-compete prevents in retirement, which is the entire life of these distributors, prevents them from competing with any product sold by Biomet of any kind, whether that existed at the time of retirement or is later added to Biomet's product line. I think it's consistent to interpret the retirement commissions, which are paid on a much, much smaller scale than the active distributorship commissions. We're talking about a fraction of a percent, consistent with that non-compete. In other words, the plaintiffs are obligated to refrain from competing with Biomet for their lifetimes in every area that Biomet sells products because they hide a deal where they would be paid for those products in retirement. And that was the intent of these parties in 1980 when Biomet was a startup trying to attract very successful salespeople when it had nothing to offer. No money, no products. All it had was this very broad retirement promise. Mr. DeArmond, to make absolutely sure that I understand, your position today is that the jury properly construed the agreement to impose an obligation on Biomet to pay these lifetime commissions on the same set or family of products that the plaintiffs were selling prior to their retirement, including the natural evolution of those products. So if they were selling joint replacement products, they get lifetime commissions on any and all such products in retirement. And if they were selling at least some types of sports medicine products, they get commissions on the full line of sports medicine products that Biomet sells today. Do I have that right? You are correct, Your Honor. You have that perfectly right. Our position on appeal is that the jury ultimately agreed with Biomet on the question of contract interpretation, that the jury adopted Biomet's construction and Biomet is appealing from a win here. What I was addressing earlier is that we still think the contracts are ambiguous because the question is not did the jury ultimately adopt plaintiff's interpretation of the contract. It's are these contracts subject to multiple reasonable interpretations. And I think the plain language of the contract indicates that they are, starting again with undefined terms and undefined phrase. Mr. Jarman, can you make sense out of the verdict, the split verdict that was awarded to Mr. Frank Schera for me? How does looking, you all know the evidence, how does looking back at the trial evidence and looking at that split verdict where, if memory serves, he got an award on the trauma products, right, but not on the sports products? Correct. Okay. And I know that, how does that make sense as an evidentiary perspective in the case? So, while I can't put my heads, myself into the heads of the jury entirely, what it seems to me is the jury credited different evidence differently for the different plaintiffs. Each plaintiff presented their own testimony. Evidence was presented through biomass witnesses, and I don't know why the jury did what it did, but what it appears to have done is credit the testimony establishing that Mr. Schera sold trauma products during his lifetime distributorship, or during his distributorship, and therefore that he should be entitled to receive trauma commissions. As to why the jury split on Mr. Schera and did not also award him sports medicine, I don't know for certain, but I must conclude from the verdict that they credited the evidence differently for Mr. Schera. It seems to me, but you help me out again, it seems to me that that argument is, that Biomet's argument as to Mr. Schera is really a variation on Biomet's broader argument as to all the plaintiffs, that they are not entitled to lifetime commissions that grow with the development of Biomet's product line. In particular, that they're not entitled to commissions on products that are now sold through a Biomet subsidiary. And the jury could have agreed with Biomet on that point, but given that Mr. Schera, like these other plaintiffs, sold at least some trauma products prior to his retirement, I take it that you think the jury could have rationally found to the contrary, that he, like the other plaintiffs, is entitled to the lifetime commissions on the full product trauma line that was sold in his former territory, even if most or even all, I guess, of that product line is sold through a subsidiary that was acquired after the settlement agreement. Right. Your Honor, that's possible. And I think it raises a very important point about the trauma products in particular. So let me just be very, very clear about the record here. Plaintiffs alleged, at summary judgment and at trial, that the distributors sold trauma products as part of their active distributorships. And what the record established was the plaintiffs retired between 1997 and 2001. For more than a decade after their retirement and before the acquisition of DePue, Biomet sold trauma products that it did not pay the plaintiffs' retirement commissions on. And contrary to the representations that have been made, there's evidence in the record, there's competing evidence in the record as to whether those were sold by EBI, sold by Biomet Trauma, or sold by the successor distributors that replaced the plaintiffs. There's testimony in the record indicating that that is, in fact, who sold these Biomet Trauma products. For a decade before DePue was acquired, Biomet did not pay retirement commissions on their products.  Then what happens in 2012? Biomet buys, not DePue, but it buys a line of trauma products from DePue. It incorporates those into Biomet's line. It sells them under Biomet's trademarks. It sells them through Biomet's distribution channels. And these are exactly the same type of products that the plaintiffs sold. In our brief, you will see testimony cited from Mr. Hess and others, where they sold, for example, something called an intramedullary nail. I won't bore you with all the details, but this is a nail that goes into the femur for repairing hip traumas and things like that. There was also testimony about Afixis products, which were post-DePue products, that are exactly the same products. It is not a separate category. Biomet did not begin selling trauma in 2012. We presented evidence of breach for more than a decade before the DePue acquisition. The DePue acquisition added to the Biomet standard product line in the same way, for example, the OEC acquisition added to the Biomet orthopedic product line. When was the DePue acquisition? It was in 2012. Yeah, I had my timeline messed up. Okay. And so while we contend that these contracts are obviously ambiguous, and that ends the inquiry, because Biomet's entire appeal is based on the assumption that this court finds the only reasonable interpretation of these contracts, that any reasonable people could ever make is their interpretation, we contend that that's plainly wrong. And even though the jury ultimately rejected our interpretation of the contracts, that it was reasonable because these are ambiguous. But even if the court accepts Biomet's proposition, the question becomes, is there sufficient evidence to support the jury's verdict under their alleged interpretation? And the answer is plainly yes, because the jury adopted their interpretation, and the jury presented with contrary evidence came to conclusions of fact, finding that the plaintiffs were entitled only to damages. And the reason you characterize it that way, which seems fair, is because you know from the jury's verdict it was split, and what I mean by split is you know that it entailed product limitations. And that was counter to what you were arguing, more consistent with what the company was arguing. Correct. In fact, we presented seven disputed categories of damages. We presented evidence only on three that we had sold them during the active distributorship. The jury credited the evidence only on two, only on trauma and sports medicine, and trauma only for Mr. Shearer. I would very much like at this point, I mean you can go back again if you wish, but to discuss the cross appeal. Counts two and three appear to me to have some overlap to the extent rebranding is mentioned in the discussion of each of those two counts. But from your briefs, I gather that count two is focused on the rebranding of existing Biomed products, whereas count three is focused on the post-merger branding of so-called naturally evolved products or new products. Am I correct? You are exactly correct again, Your Honor, and thank you. I actually hope to pivot. It's a temporal limitation. When we filed these claims in early 2016, the Zimmer Biomed merger was new at the time, and so there were two types of products that were envisioned in the claims. One is a Biomed product that had been produced prior to the merger that Biomed is taking and simply placing into a new box with Zimmer Biomed on it, and based only on that rebranding of the packaging, taking a product out of the retirement commissions. And this is what we pleaded. This is what we alleged. Those allegations are all accepted as true for purposes of Rule 12 and for purposes of this appeal, and let me be very clear, that's the position Biomed is arguing it is allowed to take. It is an interpretation of the agreement that says Biomed has the right, that is not expressly put anywhere in the contracts, to remove products like hip replacement products that are indisputably within the scope of the long-term commission program, remove them from the Biomed box, place them in a Zimmer Biomed box, and they are out of the commission structure. And the court, with very little analysis at the time, dismissed our claims under Rule 12. What we would argue is that is, at minimum, a plausible claim for relief. And because of the dismissal at Rule 12, the plaintiffs were not able to develop those claims through discovery. They were not able to present these claims at trial. One of the other arguments Biomed makes is that these are duplicative because they were somehow involved in the case. In fact, not only were we prevented from discovery, there were unopposed motions in limine at the trial stage, preventing us from introducing any evidence of any kind about our rebranding or merger claims. So, unfortunately, we believe the district court erred because we stated- I'm sorry, sir. I'm thankful that Judge Rovner raised this because I had a hard time following the substance of Count 2 and Count 3. And here's why. Because I think this does not seem to be a good, fair dealing situation, at least as Indiana law construes that, and as Judge Lozano explained. It's not an adhesion contract, and you don't have wildly disparate bargaining power and all that. So you think, well, it's got to be a breach of contract. Well, what contract are we talking about? The only contract that seems plausible to me is the distributor agreement. It's the only contract that's an issue in the case. So, for me, that raises the question, is there anything left as we're standing here now that you all did not recover on with respect to the two categories, sports and trauma, on Count 1, right? Because you recovered on Count 1. That would fit within Counts 2 and 3. In other words, as a very practical matter, I know you're saying, look, reverse on this. But is there anything even in Counts 2 and 3 anymore? And what would it be? So we know that there are certain things within Counts 2 and 3, which are not even sports and trauma products, but orthopedic products, the products that no one disputes are subject to the long-term commission program, that were rebranded and thereby removed from that commission structure. Those were not part of Count 1 that was tried, because it was undisputed commissions had been actually paid on products so long as they were left in the Biomet box. What we pleaded was that these orthopedic products, hip replacements, for example, were literally taken, just rebranded. The exact same product that had existed prior to the merger was rebranded as a Zimmer Biomet product and removed. And then the second, the merger claim, differs in time. After the merger, a new orthopedic product comes out. Zimmer Biomet has merged, and so they call it a Zimmer Biomet product. Even though it claims biosimilarity back to the Biomet product, it's developed by the Biomet engineers who now exist as a successor entity, it was taken out of the case. So that's the difference between the rebranding and the merger claim. It's did the product exist prior to the merger, or is it a new post-merger product? If we were to agree with you, you would want us to send those two counts back for discovery, just starting anew on counts two and three. Correct, Your Honor. Because the plaintiffs were not able to develop those claims at all past the Rule 12 decision, we would ask that the court reverse and remand back to the district court so that the plaintiffs can develop the record and try those claims. So your point has to be, then, that your clients were not able to recover on certain rebranded or post-merger products that in fact existed, that in fact were sold, and therefore under the long-term provision of the distributorship agreement, there would have been a retirement commission computed on. Correct. And that those claims, if you will, were entirely outside the scope of what was litigated on count one when count one went to trial. Correct, Your Honor. And I can't tell you the volume of those sales because we weren't even allowed to conduct discovery into them, much less try our claims. So while we pleaded that they exist, we have reasons of belief post-pleading that they exist, we don't know the quantum of the additional damages because we were never allowed to develop the claims. Once the Rule 12 order issued, it was used, perhaps appropriately, to say, these claims are out of the case, you are not allowed to pursue them. And what we're asking, our argument to this court is that those, whatever else they did, they pleaded plausible claims for breach of the distributorship agreements. And how do you think we should, in that case, deal with the fact that Judge DiGiulio rejected your motion to reconsider the dismissal or leave to amend those claims because he believed that you could have attempted to replead the claims within a reasonable period of time and instead waited almost a year and a half, I think it was, after discovery had closed and quite a while after the case had been transferred to him? Yes, Your Honor. So originally, when the claims were dismissed, we read the order, which dismissed certain claims and said, your claim 1 remains in the case as a dismissal with prejudice. At the time, while we disagreed with the merits of that decision, we did not have what we thought was a basis to ask the court to reconsider its opinion. We moved for reconsideration based on what we thought were facts adduced during discovery that shed new light on these claims, and we therefore later moved Judge DiGiulio to reconsider. Judge DiGiulio rejected our motion for a number of reasons, including a reticence to overrule his colleague and, I believe, observing that the appropriate place to challenge the merits of the Rule 12 decision was not a motion for reconsideration but an appeal. We do not separately challenge the district court's determination on the motion to reconsider, since it was based on other grounds. What we are challenging, we think the original court just got it wrong under Rule 12 on the merits, found that no plausible claim had been stated when, in fact, a plausible claim had been stated. So that's why we're here on appeal. And you truly think there's something to recover, even though it doesn't look like the jury drew any parent subsidiary distinctions or anything like that? There was a stipulation at the point in the time that we wouldn't even go into those issues. And I'm sorry, Your Honor, I see that I'm out of time. Go ahead. Don't you worry. You just answer. Thank you, Your Honor. No, no. Yeah, this is, you know, we're here to hear you. Thank you, Your Honor. I appreciate it. First time. So, again, because of motions in limine and other issues, the rebranding and merger claims were not triable in front of the jury. We were not allowed to introduce any kind of evidence. And, in fact, there had been a stipulation leading up to the trial that Zimmer and Zimmer Biomet, Zimmer Biomet would agree to be bound. And so the issue of the distinction between Biomet and Zimmer Biomet was not discussed in any way at the trial. We referred just to the company as Biomet, and the issue just wasn't part of the case at that time. Thank you very much, members of the panel. And thank you very much. So, let's see, Mr. Solomons. Let us give you the full five minutes that you requested because, because. Thank you, Your Honor. That's very generous, and I appreciate it. Let me start with the plain language of the agreement again, and then I'll move to the cross appeal. So, fundamentally, the error the district court made was in concluding that, based on the plain language of the agreement, it was ambiguous as to whether there were any product-based limitations at all. That was, that's what the district court held. It wasn't only ones that were a natural evolution of what was already in. None of that. Sure, but we can affirm on any ground, right? And I, at that level, you might be right, but I don't think, I think, because I think they're clearly product-based limitations, but what I think is ambiguous is what are they? Well, Your Honor, I would submit that, at a minimum, then we can agree that there was an error of law made by the district court with regard to the interpretation of these agreements. With regard to the sports products, let's start there for a moment. I didn't hear a single argument from my friend on the other side as to how those sports products, which were sold only under a separate distributor agreement with a separate corporate entity, Arthrotec, could be within the plain language of within the subject distributorship of the Biomed distribution agreement. And I don't see how that is possible, with all respect. I think that has to be an error of law to award commissions based on products that were only sold through a separate distribution agreement with a separate corporate entity and to say that those sales are net sales within the subject distributorship, meaning the Biomed distributor agreement. And if that's the case, then you have to reverse, with all respect. And at that point, there may be issues for the district court to work out in terms of the other ramifications of the error. But to submit to the jury the question of whether products that were sold only through a separate distributor agreement with a separate corporate entity could be within the plain terms of Section 9E of the Biomed distributor agreement as net sales of the subject distributorship. And for the jury to come back and say, yes, they are, that is fundamentally inconsistent with the plain terms of the agreement. And under internal law, that has to be reversed and sent back to the district court. Did Biomed contest, regarding the instructions that were given to the jury, this kind of broad reading of trauma products? Was there some language that said, you know, the jury shouldn't be deciding this issue, but more to the point, kind of the finer point that we're arguing this morning? Yeah, I think the answer is no, Your Honor. What we did was make the argument at summary judgment and make it on appeal under Dupree and under this court's decision in the Lawson case. That issue was preserved. It's not even disputed that it's preserved. The plaintiffs note on page 25 of their brief that our ambiguity finding is subject to is properly before the court and that it's a cognizable appeal on the question of whether there was ambiguity with regard to that. So we didn't raise it there. We have preserved the legal argument, and that's the legal argument we're asking this court to reverse on. With regard to the cross appeal, Your Honor, let me make the following points. That the district court rightly dismissed these counts since they are both duplicative of count one and lack any grounding in any contractual obligation. To the extent that any so-called rebranding or merger resulted in an underpayment of commissions on products within the Biomet distributorships, then it is covered by count one and was not dismissed. Plaintiffs effectively concede the duplicative nature of these counts on page 66 of their brief to this court where they acknowledge that they, quote, merely sought to hold Biomet liable for its own obligations, alleging that products renamed or reshuffled are, in fact, Biomet products. What's your response, though, to Mr. DeArmond? Mr. DeArmond was making a very practical point that, look, these were never in the litigation. So, I mean, you're familiar with the litigation, right? I am. And I'd like to correct the record on one thing that really stood out to me, Your Honor, which is the reference to the motions in Limine. I read the record exactly the opposite of what was stated. If you look, and this isn't in the appendix, but if you look at document 301 on the district court docket, that's the court's orders with regard to motions in Limine. And it specifically denied the motion in Limine that Biomet filed with regard to Zimmer or Zimmer Biomet sales. And it said that if you look at the way the plaintiff's case had developed, they weren't pursuing any damages categories related to those products. So he denied that as being not in dispute. So is your point as a practical matter that absolutely rebranded or post-merger products were always part of the litigation? Absolutely correct. Anything that they say was in fact and truly a Biomet product subject to the Biomet distributorship went to trial. And if they didn't develop it or if they put their resources on some other product line, so be it. But anything with regard to the Biomet distribution agreement that they say were truly Biomet products, they were owed on, that went to trial. And whatever categories of evidence they pursued, they pursued, and that was resolved against them. And I think you're going to have to start wrapping up, please. I would just say, Your Honor, thank you for the time. We appreciate the consideration. We ask that the court recognize the error made by the district court, and especially with regard to the sports products, but with all of it, we ask the court to reverse and at a minimum remand to the district court to sort out what issues remain. Thank you. Thank you. Thanks to both Mr. Salmons and Mr. Jarman. The case will be taken under advisement.